**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **CRIMINAL NO. RDB-21-163** |
| | * | |
| **BENJAMIN PAZ,** | * | |
| | * | |
| **Defendant** | * | |
| | * | |
| | ******* | |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION IN LIMINE**
**TO EXCLUDE EVIDENCE**

The United States of America, by and through its undersigned counsel, respectfully submits this response opposing Defendant's Motion *in limine* to Exclude Evidence (ECF No. 34). In its motion, Defendant seeks to severely limit the government's evidence and preclude admission of any mention of Defendant's material omission that led to his fraudulent procurement of naturalization, which would even presumably extend to prevent the jury from hearing the indictment returned by the grand jury in this case.

Because Defendant's proposal to exclude the introduction of facts at trial that should have been considered by the government in determining Defendant's eligibility for naturalization in the first instance flies in the face of how the Supreme Court has instructed courts to focus trials of this type as recently as 2017, and because the substance of Defendant's concealed criminal conduct is both critical to the government's burden of showing that Defendant intentionally concealed that information in order to unlawfully procure U.S. citizenship and it is not unfairly prejudicial to Defendant, the Court should deny his motion.

## **BACKGROUND**

According to his Application for Naturalization, which he initially submitted voluntarily

to the U.S. Citizenship and Immigration Service in April 2014, Defendant Benjamin Paz was born in Mexico in 1963 and immigrated to the United States at some point before 1991, when he reported establishing residence in Montgomery County, Maryland, and marrying his wife, a Bolivian national.    In 1992, he and his wife welcomed the first of three children, followed by two others in 1993 and 1995.   Defendant established a home improvement business in 1991 and a cleaning service in 1992, which he reported were both ongoing businesses up through the time of his naturalization application in April 2014.    Defendant obtained Lawful Permanent Resident status in November 2003.

In 2014, with the assistance of Catholic Charities in Gaithersburg, Maryland, Defendant filed a petition for naturalization on a form N-400. Among many other questions posed by the N-400, Section D (captioned as "Good Moral Character") required responses to several questions regarding criminal history, including #15 ("Have you **ever** committed a crime or offense for which you were **not** arrested"), #16 ("Have you **ever** been arrested, cited, or detained by any law enforcement officer for any reason), #17 ("Have you **ever** been charged with committing any crime or offense?)", "#18 ("Have you **ever** been convicted of a crime or offense?") and #21 ("Have you **ever** been in jail or prison?") (all boldface emphases in the original form).   In his original application submission, Defendant answered "No" to all of the above except for question #16 regarding prior arrests, which he answered in the affirmative.    In the N-400's Part 11, Defendant signed this application on April 30, 2014, under the warning that he was certifying his answers "under penalty of perjury under the laws of United States of America, that this application, and the evidence submitted with it, are all true and correct."

Along with the completed N-400, Defendant submitted several documents to USCIS that he had collected from the District of Columbia regarding two arrests and criminal charges that had

not resulted in convictions. In 1993, Defendant had been charged in D.C. with solicitation of prostitution, for which he was entered into a Pre-Trial Diversion and the case was *nolle prossed*. Defendant had also been charged in D.C. in 2007 with disorderly conduct, which was dismissed in September of that year when the government's principal witness, the arresting police officer, did not appear for trial.

Defendant was ultimately scheduled for his naturalization interview on January 24, 2015, in Baltimore, Maryland, with Immigration Officer Maria Sanz.   During the interview, Officer Sanz went over each of the questions Defendant had provided responses to on his N-400 and made notations in red ink checking off each answer.[1]   The final N-400 from Defendant's Alien file shows only one change Defendant volunteered (adding a cell phone number to his contact information) before he and Sanz arrived at the "Good Moral Character" section.

As they went through those questions regarding Defendant's criminal history, Defendant changed his responses to both Question #17 (Have you **ever** been charged with committing any crime or offense?) and #21 ("Have you **ever** been in jail or prison?") to "Yes" and disclosed the prior D.C. charges and admitted that he had spent a few nights in jail. Notably, however, Defendant did not change his answer to question #15, which had required him to reveal any crimes for which he had not been charged. Once all questions had been revisited, Defendant was advised again of the criminal penalties available were he to answer any questions untruthfully and he swore or affirmed that the answers were correct. Defendant signed the affirmation, and Officer Sanz recommended him for naturalization, which was granted that same day.

Unbeknownst to Officer Sanz, in the early 2000s, Defendant had stalked several D.C.

---

[1]  Although there is no record that the interview was conducted completely in English or switched to Spanish at points and Officer Sanz has no particular recollection of this interview, the government expects she will testify that she is a fluent Spanish speaker and would have explained any difficult concepts to a Spanish-speaking applicant like Defendant were he to evince confusion during an immigration interview.

rowhouses rented by college students attending nearby Georgetown University. One such house was occupied by five young women, including victim "SW."    In the summer or fall of 2003, SW was on a second-floor balcony abutting the back of her rowhouse when she saw hands grasping the vertical supports of the balcony's railing and attempting to climb up.   Suspecting it to be a fellow college student who lived nearby committing a prank, she looked over the railing. Rather than seeing a familiar face, however, SW was startled to see Defendant staring up at her when she looked down. At trial, SW will testify that the man she later confirmed was Defendant dropped from the balcony and presumably departed by the garden's back gate to the alleyway as she hurried inside and locked the doors.

Later that year, SW returned home one evening to witness one of her roommates calling police to report a suspicious man lurking in the same rear garden, which was accessible only from the alleyway.

Finally, on February 22, 2004, following a student/parent dinner party celebrating the students' pending graduation, SW returned to her row house with her roommates after her parents, who were visiting from their hometown, returned to their hotel room. After declining to join her roommates when they decided to go to another party at a nearby rowhouse, SW fell asleep on a couch located in the house's main room, which abutted the front door.

SW awoke to find Defendant with his face in her groin performing oral sex on her, her legs resting on his shoulders. Once she arrived at her senses and realized what was going on, she pushed Defendant away from her, and he somewhat calmly left—not through the front door, which was wide open, but rather through her kitchen and back out through the garden to the alleyway, strongly suggesting that her assailant had been in the house, or at least the garden, before. SW had the presence of mind to go seek help, and she soon went with friends to a hospital and submitted to a

rape kit test, where she was swabbed for DNA samples. She also reported the incident to the Metropolitan Police Department (MPD).

MPD did not obtain a DNA match to the provided sample, and the case sat dormant until 2017, when detectives identified Defendant and obtained a search warrant for his DNA.   Once Defendant's sample was submitted, it resulted in a match to the 2004 sexual assault. Subsequently, Defendant was charged with several criminal counts relating to the 2004 assault on SW, and ultimately pleaded guilty in the Superior Court for the District of Columbia to First Degree Burglary and First Degree Sex Offense in December 2017 pursuant to a plea agreement with the United States Attorney's Office. As part of the plea agreement, Defendant executed a fulsome statement of facts admitting to many, though not all, of the facts SW would testify to above. *See* Def's Mot'n. Att. 2.   He was sentenced to 144 months in prison.

On May 12, 2021, a Grand Jury of this District returned an indictment charging Defendant with Unlawful Procurement of Citizenship in violation of 18 U.S.C. § 1425, alleging that he had procured naturalization by fraud by concealing this uncharged criminal activity on his N-400 despite an affirmative duty to notify USCIS and then affirming this false response on January 24, 2015, because he well knew that his entry into a home in Washington D.C. at night without permission and sexually assaulting the female occupant while she slept in February 2004 was a crime.   ECF No. 1.   After Defendant declined to submit any motions before prior deadlines of November 3, 2021, and a re-established deadline of May 20, 2022, this Court set trial to begin on September 26, 2022.

On September 9, 2022, Defendant filed the instant motion which seeks to exclude the substance of all of the facts that Defendant concealed from Officer Sanz related to his undisclosed criminal conduct.   In the motion, Defendant argues that the government should not be allowed to

introduce evidence of Defendant's criminal conduct because he is willing to stipulate that the crimes would have disqualified him from naturalization and that introducing the facts of the criminal activity would be unfairly prejudicial.

## LEGAL STANDARD

As criminal denaturalization cases are infrequently brought, published cases considering the various contours of these prosecutions are relatively rare.   The Government has found no published case where a Court has appeared to exclude evidence of undisclosed or concealed criminal conduct in a § 1425 prosecution.   Fortunately, however, the U.S. Supreme Court took up an appeal from a conviction under § 1425 in *Maslenjak v. United States*, 137 S. Ct. 1918 (2017). While the materiality of the false statement was the primary issue considered in *Maslenjak*, Justice Kagan's opinion from the Court (from which there were no dissents) provided highly instructive guidance on the conduct of trial in these cases.

> That conclusion [that the charged false statement must be material to procurement of naturalization] leaves us with a more operational question: How should §1425(a)'s requirement of causal influence apply in practice, when charges are brought under that law? Because the proper analysis may vary with the nature of the predicate crime, we confine our discussion of that issue to the kind of underlying illegality alleged here: a false statement made to government officials. Such conduct can affect a naturalization decision in a single, significant way—by distorting the Government's understanding of the facts when it investigates, and then adjudicates, an application. **So the issue a jury must decide in a case like this one is whether a false statement sufficiently altered those processes as to have influenced an award of citizenship.**

> The answer to that question, like the naturalization decision itself, turns on objective legal criteria. Congress has prescribed specific eligibility standards for new citizens, respecting such matters as length of residency and "physical[ ] presen[ce]," understanding of English and American government, and (as previously mentioned) "good moral character," with all its many specific components. See 8 U.S.C. §§1423(a), 1427(a); *supra,* at ___ , 198 L. Ed. 2d, at 468. Government officials are obligated to apply that body of law faithfully— granting naturalization when the applicable criteria are satisfied, and denying it when they are not. See *Kungys*, 485 U. S., at 774, n. 9, 108 S. Ct. 1537, 99 L. Ed. 2d 839 (opinion of Scalia, J.); *id.*, at 787, 108 S. Ct. 1537, 99 L. Ed. 2d 839

(Stevens, J., concurring in judgment). And to ensure right results are reached, a court can reverse such a determination, at an applicant's request, based on its "own findings of fact and conclusions of law." 8 U.S.C. §1421(c). The entire system, in other words, is set up to provide little or no room for subjective preferences or personal whims. Because that is so, the question of what any individual decisionmaker might have done with accurate information is beside the point: The defendant in a §1425(a) case should neither benefit nor suffer from a wayward official's deviations from legal requirements. **Accordingly, the proper causal inquiry under §1425(a) is framed in objective terms: To decide whether a defendant acquired citizenship by means of a lie, a jury must evaluate how knowledge of the real facts would have affected a reasonable government official properly applying naturalization law.**

**If the facts the defendant misrepresented are themselves disqualifying, the jury can make quick work of that inquiry. In such a case, there is an obvious causal link between the defendant's lie and her procurement of citizenship.** To take an example: An applicant for citizenship must be physically present in the United States for more than half of the five-year period preceding her application. See 8 U.S.C. §1427(a)(1). Suppose a defendant misrepresented her travel history to convey she had met that requirement, when in fact she had not. **The Government need only expose that lie to establish that she obtained naturalization illegally—for had she told the truth instead, the official would have promptly denied her application. Or consider another, perhaps more common case stemming from the "good moral character" criterion. See §1427(a)(3); *supra*, at ___, 198 L. Ed. 2d, at 468. That phrase is defined to exclude any person who has been convicted of an aggravated felony. See §1101(f)(8). If a defendant falsely denied such a conviction, she too would have gotten her citizenship by means of a lie—for otherwise the outcome would have been different. In short, when the defendant misrepresents facts that the law deems incompatible with citizenship, her lie must have played a role in her naturalization.**

*Maslenjak*, 137 S. Ct. 1927-29 (2017) (emphases added).

## ARGUMENT

### A. The Concealed Facts ARE the Core of the Government's Case in a §1425 Prosecution.

Although Defendant would distinguish *Masleniak* as inapposite because he is not contesting materiality, this misses the proverbial forest for the trees. *Masleniak* instructs that the jury's principal inquiry in a §1425(a) trial is not to determine whether a particular statement made by Defendant in the naturalization process was false, but whether "the real facts would have

affected" the grant of naturalization.

Thus, those "real facts" of Defendant's concealed crimes that should have led to denial of naturalization are not merely prior bad acts or matters peripheral to the case at hand, they are central and intrinsic to the Government's burden of proof and must not be hidden from the jury simply because they hamper his campaign to retain his fraudulently obtained citizenship. Defendant's attempt to force the government into a sanitized stipulation wherein he would admit to each of §1425's elements (albeit bereft of facts) except for knowledge and then argue—without Defendant's testimony providing any affirmative evidence for such—that he didn't understand he needed to provide that information is, frankly, disingenuous. This is akin to a bank robbery defendant who seeks to claim he lacked criminal intent because he didn't understand the banking system asserting that Court should exclude all evidence regarding the circumstances of the robbery, including evidence of preparatory surveillance and injuries to bystanders caused by his escape, and only allow the Government to put on evidence regarding his spoken interaction with the teller, so long as he stipulates to the remaining elements without any substantive facts. Neutering the government's case as Defendant requests would risk a serious miscarriage of justice.

**B.  Evidence of Defendant's Concealed Criminal Conduct is not Unfairly Prejudicial.**

Defendant's complaint that to allow the evidence of his concealed criminal activity would encourage the jury to convict him for the wrong reason and is therefore prejudicial is also undermined by *Masleniak*. The government agrees that this evidence is prejudicial to Defendant, but disputes that it is *unfairly* prejudicial. Rule 403 of the Federal Rules of Evidence requires a trial court to determine the amount of unfair prejudice resulting from the introduction of a piece of evidence. The phrase "unfair prejudice" does not refer alone to the fact that a particular piece of evidence will have adverse effects on a party's case. As courts have often observed, most evidence

offered by an opponent should have this effect. *See Dollar v. Long Manufacturing, N.C., Inc.*, 561 F.2d 613, 618 (5th Cir. 1977), *cert. denied*, 435 U.S. 996, 98 S. Ct. 1648, 56 L. Ed. 2d 85 (1978). Rather, "'unfair prejudice' within this context means an undue tendency to suggest (a) decision on an improper basis, commonly, though not necessarily, an emotional one." Notes of the Advisory Committee, USCS Fed Rules Evid R 403, Part 1 of 4.

Here, there is little danger that the jury will convict Defendant of naturalization fraud for the wrong reason, because his concealment of the criminal activity the government presently seeks to admit evidence of is the very reason he was ineligible for naturalization, and why it should now be revoked. Indeed, *Masleniak* requires a jury to find that the concealed criminal acts made him ineligible for naturalization (or at least less likely to have obtained such), not just that a defendant made a false statement—even one made knowingly. Finding Defendant guilty in the instant case, in large part due to the criminal acts which disqualified him for citizenship, does not offend justice, so long as the jury is appropriately instructed that they must find that Defendant's subsequent concealment of them was knowing.

**C. Introduction of the Substance of Defendant's Criminal Conduct is Relevant and Critical to the Government's Burden to Show Defendant's Concealment of those Facts was Knowing and Intentional.**

The Court should not be lulled into unfairly impairing the Government's case by excluding the substance of Defendant's undisclosed criminal activity on Rule 403 grounds, as doing so would unfairly handicap it in its burden to prove that Defendant knowingly withheld this information to procure naturalization.

Defendant has already signaled that his trial defense is going to be that he did not understand Question #15 and did not realize he was required to truthfully disclose uncharged criminal conduct. While it is unclear how Defendant will be able to argue this without taking the

stand—and the Government would ask that such argument be precluded without Defendant's testimony since Ms. Sanz has no particular memory of her interaction with him and cannot testify to his comprehension—it is obvious how mandating that the government be limited to an anodyne, sterilized stipulation that Defendant had committed a disqualifying crime will hamstring its case in this regard.

Defendant's motion, if granted, would force the jury to speculate on the nature of the his concealed crimes, and simply reciting that it would have been disqualifying scarcely helps the issue, since the jury would also not know what crimes are disqualifying and would also have to speculate in that regard. Introducing the facts of Defendant's burglary and sex offenses is necessary to allow them to make the reasonable inference that, owing to the magnitude and aggravated nature of the crimes, it is far more likely that he intentionally concealed these facts from the immigration authorities because he knew that disclosing them would disqualify him and potentially lead to prosecution for crimes that he had, at that point, successfully escaped justice for. That makes introducing the facts of his crimes highly probative evidence of his motive and intent to conceal.

Keeping these facts from the jury's view would unfairly allow Defendant to assert more credibly during arguments that he unintentionally failed to disclose those facts. If the jury doesn't know whether the undisclosed criminal activity was something like a bar fight assault/battery, food stamp or tax fraud that Defendant might have forgotten about, or a DUI that he may have dismissed as inconsequential, they might be fooled into believing that his concealment of his uncharged criminal activities was unintentional.   But the (admittedly alarming) facts of the criminal acts Defendant committed against SW—made more disturbing by the fact that he was then a 37 year-old married father of three at the time and that he had apparently stalked her and her roommates for months beforehand—makes it far less likely that the omission was unintentional. Thus, these

10

facts should not be hidden from the jury.

      D. **SW's Testimony is Not Superfluous nor Is Stipulating to Materiality Sufficient for the Government's Case**.

Defendant argues that SW's testimony should also be excluded because her testimony regarding Defendant's stalking of her residence is an "additional allegation[] not part of Mr. Paz's admission of guilt and his prior conviction (the one specifically alleged in the indictment) does not rest upon these additional factual allegations SW intends to provide." Like Defendant's other contentions, this misses wide of the mark.

As a starting point, the Indictment does not even refer to defendant's conviction, which, to the extent it is relevant, only provides additional proof of his concealed criminal acts.   The indictment in this case properly focuses on the undisclosed criminal acts (i.e., "as he then well knew, in 2004 he entered a home in Washington, D.C., at night without permission and sexually assaulted the female occupant while she slept"), not an undisclosed conviction, as there was no extant conviction at the time Defendant submitted his fraudulent application.   It is the conduct that matters, not the convictions.

SW's proposed testimony will provide the jury with additional facts surrounding Defendant's burglary and sexual offense that were not included in his plea's statement of facts, which again goes to his intent to conceal because it makes his ultimate sexual assault on her all the more disturbing. SW's testimony regarding Defendant's earlier attempt to enter the living space of the home where she and four other young women resided through the back garden months before he sexually assaulted her shows that Defendant had planned such actions for months—not that it was a one-time error in judgment wherein he came across an open door, a sleeping young woman, and made a one-time aberrant decision to take sexual advantage of her.   This is relevant to the jury's determination of knowledge and intent in concealing his criminal activities from

11

USCIS and Officer Sanz.

**E.  Defendant's Proffered Stipulations are Insufficient and it Would be Improper to Force the Government to Rely on Them.**

Defendant's offer to stipulate to materiality is insufficient. The standard jury instruction for stipulations is that the jury "should" – not that it *must* – consider stipulated facts as true.   This is consistent with Fourth Circuit caselaw, which maintains that the Government still bears the burden of persuading the jury it has proven the case beyond a reasonable doubt even if the parties have entered into a stipulation. *See United States v. Muse*, 83 F.3d 672, 679 (4th Cir. 1996) *citing United States v. Milton*, 52 F.3d 78, 81 (4th Cir.), *cert. denied*, 133 L. Ed. 2d 152, 116 S. Ct. 222 (1995) ("While a valid stipulation relieves the prosecution of the burden of producing any other evidence in order to establish the fact stipulated, it does not relieve the prosecution from the burden of "proving every element of the crime" beyond a reasonable doubt.") *Cf. Estelle v. McGuire*, 502 U.S. 62, 69 (1991) (this burden "is not relieved by a defendant's tactical decision not to contest an essential element of the offense").

Outside of the § 922(g) prior disqualifying felony context, a defendant cannot force the Government to enter into a stipulation that compromises its ability to meet its burden of proof using evidence of its own choosing. *See Old Chief v. United States*, 519 U.S. 172, 186-87 (1997)("the Government invokes the familiar, standard rule that the prosecution is entitled to prove its case by evidence of its own choice, or, more exactly, that a criminal defendant may not stipulate or admit his way out of the full evidentiary force of the case as the Government chooses to present it. The authority usually cited for this rule is *Parr v. United States*, 255 F.2d 86 (CA5), *cert. denied*, 358 U.S. 824, (1958), in which the Fifth Circuit explained that the "reason for the rule is to permit a party 'to present to the jury a picture of the events relied upon. To substitute for such a picture a naked admission might have the effect to rob the evidence of much of its fair and legitimate

weight.'" 255 F.2d at 88 (*quoting Dunning v. Maine Central R. Co.*, 91 Me. 87, 39 A. 352, 356 (1897)). This is unquestionably true as a general matter.")

## <u>CONCLUSION</u>

For the reasons above, the Court should deny Defendant's Motion *in limine* to Exclude Evidence in this case.

Respectfully submitted,

Erek L. Barron
United States Attorney


By: _____/s/_____
    Adam K. Ake
    Michael E. Aubin
    Assistant United States Attorneys

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on September 14, 2022, a copy of the foregoing Government's

Response to Defendant's Motion was served via electronic case filing upon the following:

       Elizabeth Lopez
       Assistant Federal Public Defender
       100 South Charles Street
       Tower II, 9th Floor
       Baltimore, Maryland 21201


By:_____/s/_____
      Adam K. Ake
      Assistant United States Attorney