**United States District Court for
the District of Maryland**

|  |  |
|---|---|
| **United States**<br><br>    v.<br><br>**Benjamin Paz** | No. 1:21-cr-163-RDB |

**Motion in Limine to Exclude Privileged Testimony of Defendant
Benjamin Paz's Legal Representative**

Approximately six days before trial, the government indicated it intends to call Celia Rivas, Defendant Benjamin Paz's legal representative during his naturalization proceedings, to testify at Mr. Paz's upcoming criminal trial on one count of unlawfully procuring naturalization and citizenship, under 18 U.S.C. § 1425(a). Mr. Paz now moves this Court in limine to exclude Ms. Rivas from testifying to privileged matters arising during her representation of him.

### Background

**A. The Department of Justice Recognizes Celia Rivas as a Legal Representative on Immigration Matters**

Ms. Rivas serves as the immigrant services coordinator at Catholic Charities in Washington, DC.[1] She joined Catholic Charities in 1991 after obtaining a law degree from

---

[1] Catholic Charities, Archdiocese of Washington, Celia Rivas, *available at* https://www.catholiccharitiesdc.org/ils-staff/celia-rivas/ (last visited Sept. 22, 2022), attached as Exhibit A.

1

Pontifical Catholic University of Peru and a masters in law from Howard University.[2] Although she is not a member of any bar in this country, Ms. Rivas serves as a "fully accredited representative" under the Department of Justice's Recognition and Accreditation Program.[3] That program allows non-attorney accredited representatives "to represent aliens before the Department of Homeland Security (DHS) and the Executive Office for Immigration Review (EOIR), which includes the immigration courts and the Board of Immigration Appeals (BIA)."[4] The goal of the program is "to increase the availability of competent immigration legal representation for low-income and indigent persons, thereby promoting the effective and efficient administration of justice."[5]

The EOIR created the Recognition and Accreditation Program pursuant to regulations promulgated at the direction of Congress. *See* 8 C.F.R. § 1292.11 Credits (citing 8 U.S.C. §§ 1103, 1362). To qualify as an accredited representative, an advocate must work for a "Recognized Organization," defined as "a non-profit religious, charitable, social service, or similar organization that provides immigration legal services primarily to low-income and indigent clients within the United States," and that "has access to adequate knowledge, information, and experience in all aspects of immigration law and procedure." *Id.* § 1292.11(a)(1), (4). The accredited-representative application requires the recognized organization to attest that the applicant whom it is sponsoring has "broad knowledge and

---

[2] Ex. A.

[3] Ex. A.

[4] Department of Justice, Recognition & Accreditation (R&A) Program, *available at* https://www.justice.gov/eoir/recognition-and-accreditation-program (last visited Sept. 22, 2022), attached as Exhibit B, at 1.

[5] Ex. B.

adequate experience in immigration law and procedure."[6] Among other things, the applicant must have "completed at least one course on the fundamentals of immigration law, procedure, and practice," which should cover "various forms of relief before the immigration courts and DHS, such as naturalization, family-based petitions, grounds of inadmissibility and removability, removal defenses, immigration consequences of crimes, and case management."[7] In most cases, multiple such courses are required.[8]

The accredited representative must also possess "skills essential for effective litigation and advocacy," such as "[p]erforming legal research," "[p]resenting documentary evidence at a hearing before an immigration judge," "[q]uestioning witnesses at a hearing before an immigration judge," "[p]ursuing appeals before the BIA," and "[p]reparing motions and briefs for consideration by an immigration judge or the BIA."[9] She must demonstrate mastery of these skills by providing, e.g., a "log of hours and observations from attending immigration court hearings," a "log of hours spent shadowing an attorney or Accredited Representative who practices before EOIR," "[r]edacted writing samples of briefs and motions co-authored by the [applicant]," "[e]vidence of attendance at trainings that focus on practice before EOIR

---

[6] Department of Justice, Form EOIR-31, Request by Organization for Accreditation or Renewal of Accreditation of Non-Attorney Representative, *available at* https://www.justice.gov/eoir/page/file/1276431/download (last visited Sept. 22, 2022), attached as Exhibit C, at 3.

[7] Ex. C at 3.

[8] *See* EOIR, Recognition and Accreditation Program Frequently Asked Questions, *available at* https://icor.eoir.justice.gov/en/faq/ (last visited Sept. 22, 2022), attached as Exhibit D, at 7 ("However, one course alone will rarely satisfy the broad-knowledge requirement.").

[9] Ex. C at 4.

and the development of advocacy skills," and "[d]ocumentation showing participation in mock trials or similar activities."[10]

If the application is approved, the accredited representative may "appear before EOIR without attorney supervision."[11] She is then subject to the same rules of professional conduct that govern attorneys appearing before EOIR. *See* 8 C.F.R. § 1292.3 (cross-referencing 8 C.F.R. § 292.3, which in turn cross-references 8 C.F.R. § 1003.102).

**B. Ms. Rivas Formally Represented Mr. Paz in Connection with His Application for Naturalization**

In her capacity as a fully accredited representative, Ms. Rivas represented Mr. Paz in connection with his application for naturalization. Indeed, she submitted her notice of appearance explicitly advising the DHS that she was representing Mr. Paz on immigration matters related to the Form N-400, the application for naturalization.[12] She signed the N-400 certification indicating that she prepared the application on Mr. Paz's behalf.[13]



And as Mr. Paz's legal representative, she submitted his application materials to the USCIS.[14]

---

[10] Ex. C at 4.
[11] Ex. C at 4.
[12] Ex. E (Celia Rivas Form G-28)
[13] Ex. F (Form N-400)
[14] Ex. G (Letter from Celia Rivas to USCIS).

4



## Argument

Given the nature of Ms. Rivas' relationship with Mr. Paz, any statements made in furtherance of that relationship are protected by the attorney-client privilege. That privilege "empowers a client—as the privilege holder—to refuse to disclose and to prevent any other person from disclosing confidential communications between him and his attorney." *In re Search Warrant Issued June 13, 2019*, 942 F.3d 159, 173 (4th Cir. 2019). The Supreme Court has "emphasiz[ed the] importance of attorney-client privilege," which is designed "to ensure 'full and frank communication' between a client and his lawyer and 'thereby promote broader public interests in the observance of law and administration of justice.'" *Id.* (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981)). As the Court has explained, "the attorney-client privilege exists because 'sound legal advice or advocacy serves public ends and . . . such

5

advice or advocacy depends upon the lawyer's being fully informed by the client.'" *Id.* (quoting *Upjohn*, 449 U.S. at 389).

Ordinarily, a party claiming the privilege must show that "the person to whom [a] communication was made . . is a member of the bar of a court, or is his subordinate." *N.L.R.B. v. Interbake Foods, LLC*, 637 F.3d 492, 501-02 (4th Cir. 2011). But the Federal Rules of Evidence authorize federal courts to expand the scope of a privilege when appropriate. Rule 501 provides that "[t]he common law—as interpreted by United States courts in the light of reason and experience—governs a claim of privilege unless" the Constitution, a federal statute, or a rule prescribed by the Supreme Court "provides otherwise." Fed. R. Evid. 501. Under this Rule, "'privileges shall continue to be developed by the courts of the United States under' the 'reason and experience' standard." *United States v. Sterling*, 724 F.3d 482, 500 (4th Cir. 2013) (quoting Fed. R. Evid. 501 advisory committee's note). The Rule therefore "leaves the door open for courts to adopt new commonlaw privileges, *and modify existing ones*, in appropriate cases." *Under Seal v. United States*, 755 F.3d 213, 217 (4th Cir. 2014) (emphasis added).

Exercising this authority, a number of courts have held the privilege extends to a client's communications with a non-lawyer who is providing legal services. In *Escamilla v. SMS Holdings Corp.*, No. CV 09-2120 (ADM/JSM), 2011 WL 13243580, at *2 (D. Minn. June 28, 2011), the court determined that Cynthia Anderson—a non-lawyer "Accredited Representative" whom the BIA had "authorized to represent clients before the USCIS [(U.S. Customs and Immigration Service)] and the BIA"—was equivalent to an attorney for purposes of the attorney-client privilege. The court reasoned that, like lawyers, accredited representatives are "governed by the rules of professional conduct and have knowledge of immigration laws and procedures that are related to furthering the interests of aliens and the

6

government in immigration proceedings." *Id.* at *6. Ultimately, the court determined, "the substance of the function, rather than the label given to the individual . . . , controls the determination" of whether a privilege should apply. *Id.* at *7.

The court also relied on the fact that federal regulations expressly authorize accredited representatives "to represent aliens in immigration proceedings." *Id.* at *7. As the court explained, "[o]ther courts in examining the role of agents or advocates endowed with authority, pursuant to state or federal law, to be involved with legal matters, have extended a privilege to communications between a client and those advocates." *Id.* (citing cases holding privilege applies to patent agents and parent advocates). Denying the privilege under these circumstances would thwart Congress' intent in permitting the use of accredited representatives, and would make immigrants less likely to confide in their advocates:

> Congress, through the regulations enacted by the USCIS, has created a system where an immigrant may utilize an attorney or an accredited representative to represent them in matters falling before the jurisdiction of the USCIS. The ability to proceed with representation using an accredited representative would be severely hampered if the conversations between these individuals were not protected from discovery. This is especially true in the immigration context, where sensitive information regarding an alien's ability to stay in the United States is disclosed. If clients are unsure of their legal status, they will be much less likely to confide in an accredited representative if those communications are subject to discovery. As such, finding that no privilege exists between accredited representatives and aliens in the immigration context would frustrate the regulatory scheme set forth by the USCIS. "Whenever applicable law limits the performance of essentially legal functions to individuals specifically authorized to that end, the underlying basis for the privilege . . . must be given its natural effect."

*Id.* (quoting *Vernitron Med. Prods., Inc. v. Baxter Labs., Inc.*, 186 U.S.P.Q. 324, 326 (D.N.J. 1975)).

The same logic applies here. Ms. Rivas is an accredited representative who, like the accredited representative in *Escamilla*, is "governed by the rules of professional conduct," has "knowledge of immigration laws and procedures that are related to furthering the interests of

7

aliens and the government in immigration proceedings," and is expressly authorized by regulation "to represent aliens in immigration proceedings." *Id.* at \*6-7. To become an accredited representative, she had to undergo extensive training and demonstrate mastery of a wide range of topics related to immigration law. And as in *Escamilla*, denying the privilege here would "frustrate the regulatory scheme set forth by the USCIS," as immigrants who know "communications are subject to discovery" will be less likely "confide in an accredited representative." *Id.*[15]

Similarly, the Federal Circuit held in *In re Queen's Univ. at Kingston*, 820 F.3d 1287 (Fed. Cir. 2016), that a privilege exists between a patent holder and its patent agent. This holding rested on an analogy to the attorney-client privilege. The court noted that the Supreme Court had previously held "'the preparation and prosecution of patent applications for others constitutes the practice of law.'" *In re Queen's Univ.*, 820 F.3d at 1296 (quoting *Sperry v. State of Florida ex rel. Florida Bar*, 373 U.S. 379, 383 (1963)). As a result, "the need for candor between a client and his or her legal professional in relation to the prosecution of a patent" is as strong as a client's need for candor when consulting an attorney. *Id.* Patent agents' "professional status," the court explained, was functionally identical to lawyers', as patent agents "must pass an extensive examination on patent laws and regulations and must have a technical or scientific degree before they may represent patent applicants before the Patent Office," and they "have very specific ethical obligations imposed by the Patent Office." *Id.* at 1300.

---

[15] The *Escamilla* court also cited several other facts in concluding communications with the accredited representative were privileged, e.g., the client testified that she "believed that Anderson was an attorney" and that "it was her understanding that all information produced was protected from disclosure." *Id.* at \*6. Without an evidentiary hearing, Mr. Paz is currently unable to establish similar facts. Regardless, these facts do not appear to have been determinative in *Escamilla*, and the absence of a similar record in this case is therefore immaterial.

8

In addition, the court reasoned that the Supreme Court in *Sperry* had "emphasized" that Congress' statutory scheme expressly "authorized and continues to permit the practice of law by patent agents when appearing before the Patent Office." *Id.* Accordingly, a client "has a reasonable expectation that all communications relating to obtaining legal advice on patentability and legal services in preparing a patent application will be kept privileged. Whether those communications are directed to an attorney or his or her legally equivalent patent agent should be of no moment." *Id.* at 1298. Refusing to recognize a patent-agent privilege would therefore frustrate Congress' intent in "establish[ing] a dual track for patent prosecution." *Id.* at 1300. Just as the lack of a privilege would discourage clients from confiding in their attorneys, "the lack of a patent-agent privilege would hinder communications between patent agents and their clients, undermining the real choice Congress and the Commissioner have concluded clients should have between hiring patent attorneys and hiring non-attorney patent agents." *Id.* at 1300.

All these rationales apply with equal force to Ms. Rivas. Although the Supreme Court has never held accredited representatives engage in the "practice of law" (perhaps because it has never been asked to), that is exactly what they do. Accredited representatives must have training and expertise that is materially indistinguishable from that of an immigration attorney. Indeed, the accredited-representative application says, in two different places, that an applicant may "practice immigration law" if approved.[16] And as in *In re Queen's University*, refusing to recognize the privilege here would both frustrate Congress' immigration scheme (as reflected in the regulations governing the Recognition and Accreditation Program) and disincentivize candid communication between an immigrant and his legal counsel.

---

[16] Ex. C at 1, 3.

Finally, practical and equitable considerations counsel in favor of recognizing an attorney-client privilege in Mr. Paz's case, as the Supreme Court's opinion in *Jaffee v. Redmond*, 518 U.S. 1 (1996), demonstrates. There, the Court for the first time recognized a "psychotherapist privilege" under Federal Rule of Evidence 501. *Jaffee*, 518 U.S. at 4. Having concluded such a privilege exists, the Court had to determine as well how broad the privilege should be, and in particular whether it should extend not only to psychiatrists and psychologists, but also to social workers. *Id.* at 15. The Court concluded it should:

> Today, social workers provide a significant amount of mental health treatment. Their clients often include the poor and those of modest means who could not afford the assistance of a psychiatrist or psychologist, but whose counseling sessions serve the same public goals. . . . We therefore agree with the Court of Appeals that "[d]rawing a distinction between the counseling provided by costly psychotherapists and the counseling provided by more readily accessible social workers serves no discernible public purpose."

*Id.* at 15-16.

So it is here. Accredited representatives' clients are often low-income immigrants who are unable to afford a licensed attorney, but whose consultations with accredited representatives serve "the same public goals" as consultation with an attorney. *Id.* at 16. Excluding accredited representatives from the attorney-client privilege would therefore "serve[] no discernible public purpose." *Id.*

This Court should therefore hold Mr. Paz's conversations with Ms. Rivas are protected by the attorney-client privilege. Alternatively, and for all the same reasons described above, the Court should recognize an independent client-accredited representative privilege, as Federal Rule of Evidence 501 permits. *See Sterling*, 724 F.3d at 501 ("Rule 501 thus leaves the door open for courts to adopt new common-law privileges, and modify existing ones, in appropriate cases."). In either event, any conversations Mr. Paz had with Ms. Rivas regarding

10

his naturalization process should be considered privileged, and the Court should exclude them at trial.

                                    Respectfully submitted,

                                    James Wyda
                                    Federal Public Defender

                                      _____/s/_____
                                    Elizabeth Lopez
                                    Francisco Carriedo
                                    Assistant Federal Public Defenders
                                    100 S. Charles Street
                                    Tower II, 9th Floor
                                    Baltimore, MD 21201
                                    (410) 962-3962
                                    elizabeth_lopez@fd.org
                                    francisco_carriedo@fd.org